**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

WILLIAM H. ARMSTRONG,                  :
                                       :
          Plaintiff,                   :
                                       :
     v.                                :  Civil Action No. 07-1963 (JR)
                                       :
TIMOTHY GEITHNER, *et al.*,            :
                                       :
          Defendants.                  :

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

          William Armstrong is a former special agent for the
Treasury Inspector General for Tax Administration (TIGTA).  After
a troubled period of his employment there, he applied for a new
position in the Department of Agriculture.  That application was
torpedoed by anonymous letters that revealed to USDA that
Armstrong had been under investigation within TIGTA.  Armstrong
sued the Secretary of the Treasury, his former supervisor Rodney
Davis, and unnamed TIGTA employees, alleging that the letters and
their revelations violated his rights under the Privacy Act, 5
U.S.C. § 522(a), and asserting various common law torts.  These
allegations were tried to the Court in two phases, on August 26,
2008, and on December 4, 2008.  In that bench trial, Armstrong
failed to establish that the information contained in the
anonymous letters had been retrieved from a record held in a
system of records - the necessary predicate of his Privacy Act
claim.  None of Armstrong's tort claims against Treasury or
persons in their capacity as Treasury employees is cognizable

under the Federal Tort Claims act.  Judgment will accordingly be
entered in favor of the defendants.

## Background

In October 2006, when Armstrong was still employed at
TIGTA, someone sent an anonymous letter to the Inspector
General's Office accusing him of unlawfully accessing various
records and computer databases.  Dkt. #31-5.  That accusation
triggered an internal TIGTA investigation, led by Rodney Davis.[1]
Dkt. #34-2 (16:3-24); Pl. Aff. ¶23.  Armstrong's badge and
credentials were taken, his use of a government-owned car was
revoked, Pl. Aff ¶25, he was escorted from the building, Dec. Tr.
(34:9-13), and he was temporarily reassigned to the Technical
Services and Firearms Division, Pl. Aff at ¶25.[2]

Armstrong was not officially told of the reason for the
investigation at first, but within the month a friend
unaffiliated with the investigation advised him that it was for
unauthorized access.  Pl. Aff. ¶28.  The record suggests that

_____

[1]In 2003 the plaintiff conducted an internal investigation
on Davis in connection with an incident where Davis lost his
official credentials.  Pl. Aff. ¶3.  When Davis later became his
supervisor, the plaintiff complained about Davis's managerial
style and accused him of sleeping on duty.  Dec. Tr. (95:14-16).
Given this and other history between the two, the decision to
assign Davis to investigate the plaintiff was odd.

[2]Although the assignment was ostensibly temporary, because
of the events described in this memorandum, the plaintiff did not
return to work as a supervisor at TIGTA.  Dec. Tr. (89:25-902).

- 2 -

this information had become part of the gossip mill within TIGTA. Pl. Depo. 16:5-12; 19:16-24, 21:4-8; 22:12-23:23.[3]

On February 7, 2007, the U.S. Attorney's Office declined to prosecute Armstrong, Pl. MJ at 9, but TIGTA continued its investigation.  A few days later, Armstrong was interviewed by investigators and admitted to accessing the databases.  Pl. Aff. ¶32.  TIGTA did not immediately act on his admission because its investigation of the plaintiff was "lumped" together with other investigations.  Pl. Aff ¶40.  In March 2007, the plaintiff began looking for another job, *id.* at ¶33, and on August 15, 2007, he was offered employment within USDA, *id.* ¶41.  His new job was scheduled to begin on September 2, 2007.  *Id.*

From around August 23 to August 27, 2007, six anonymous letters were sent to various individuals at USDA, all of them disclosing information about TIGTA's investigation of Armstrong. Compl. Exs. 1-6.  After receiving them, USDA apparently "stayed," and thus effectively terminated, the employment offer it had made to Armstrong.  Pl. MJ p. 13.  On September 4, 2007 a TIGTA official informed Armstrong that a proposed recommendation had been made regarding the internal investigation.  Pl. Aff. ¶49.

---

[3]There are numerous other references in the record about the existence of such a rumor mill, and about TIGTA employees, and others, possessing knowledge about the investigation derived from unknown sources.  *See, e.g.*, Dec. Tr. 8:23-9:23; 39:17-41:5; Compl. ¶34; Silvis Dep. (125:6-126:2).

The plaintiff agreed to a thirty day suspension and ultimately resigned from the agency.  *Id*.

Armstrong then filed this action.  His theory, until the first day of trial, was that a person or persons who had been involved in TIGTA's internal investigation must have written and sent the anonymous letters that unraveled his new job at USDA, and that, perforce, or perhaps *res ipsa loquitur*, the information must have come from a system of records within TIGTA.  *See*, Compl. counts I-VI.  It was revealed on the very eve of the trial, however, and confirmed by the perpetrator herself, who was called as the first witness at trial, that the sender of all the anonymous letters – the first, accusatory letter to the TIGTA Inspector General and the six letters sent to hiring officials at USDA - was in fact Armstrong's fellow TIGTA investigator Karen Thompson.  Aug. Tr. (20:6-7; 22:11-22).  On the witness stand, Thompson categorically denied accessing any records and explained that she assembled the information in the letters from observation and surmise.  Dec. Tr. (117:20:-25).  I found her testimony to be generally "evasive, dissembling, and not credible," Aug. Tr. 120:4-8, suspended the trial, and allowed the plaintiff limited discovery to explore this new lead.

After three months, however, Armstrong had found no evidence that Thompson obtained her information from protected records.  When the trial re-commenced, on December 4, 2008, he

adduced the testimony of several subpoenaed witnesses, all TIGTA investigators, including Davis, Kelly Sopko, Davis' supervisor Michael Delgado, and Thompson's husband (and TIGTA agent) David Sutkus.  Sutkus and Sopko, neither of whom were affiliated with the investigation of Armstrong, denied having accessed the files of TIGTA's internal investigation.  Davis and Delgado denied divulging information about the investigation to Thompson or unauthorized third parties.  The evidence also established that, because Armstrong was a supervisor, the records of his investigation, in order to protect them from unauthorized access, were not logged into the agency's database.  Dec. Tr. (91:15-92:3).  Thus, there was no trail or record of who, if anyone, may have accessed them.

## Analysis

Counts 1-6 of Armstrong's complaint deal with the six letters sent to USDA, alleging that each of them was a violation of § 552a of the Privacy Act.[4]  Count 7 is a claim of libel, against Davis.  Counts 8-12 allege that TIGTA is responsible under the Federal Tort Claims Act for the acts of its employees

---

[4]In his brief, Armstrong advances a number of arguments under the Privacy Act that go well beyond the allegations of his complaint, among them that the manner in which TIGTA stored the record of his investigation violated § 552a(g)(1)(D) of the Privacy Act and that, after Thompson sent her six letters to USDA, Delgado made prohibited disclosures when he spoke with a Ms. Horsley at the USDA and later sent a letter to her.  These arguments are not germane to the matters before me and are not addressed in this memorandum.

for intentional infliction of emotional distress, negligent infliction of emotional distress, false light, invasion of privacy, and intentional interference with prospective contractual relationships.

## 1. The Privacy Act Claims

Subject to exceptions that are not implicated here, under 5 U.S.C. § 552a(b) "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains."  To succeed on a damages suit for unlawful disclosure a plaintiff must therefore show that: "(1) the information in question is a 'record' contained within 'a system of records;' (2) the agency improperly 'disclosed' the information; (3) an adverse impact resulted from the disclosure; and (4) the agency's disclosure was willful or intentional."  *Krieger v. U.S. Dept. of Justice,* 529 F.Supp.2d 29, 41 (D.D.C. 2008).  In general, "liability for nonconsensual disclosures is limited by the 'rule of retrieval,' which requires that the information disclosed be 'directly or indirectly retrieved from a system of records.'"  *Id.* at 47 *(quoting Fisher v. Nat'l Inst. of Health, et al.*, 934 F.Supp. 464, 473 (D.D.C. 1996), aff'd without opinion, 107 F.3d 922, 1996 WL 734079 (D.C. Cir. 1996)).  "'[I]nformation derived solely from

independent sources is not prohibited by the statute even though identical information may be contained in an agency system of records.'"  *Id.* (*quoting Fisher*, 934 F.Supp. at 473 *(quoting Thomas v. United States Dep't of Energy*, 719 F.2d 342, 345 (10th Cir. 1983)).

Armstrong adduced no evidence that the information in the letters came directly from records contained within a system of records.  As a result, the theory of the plaintiff's case is essentially: (1) that Thompson's written anonymous complaint to TIGTA became a protected record once she sent it, so that she herself was prohibited from revealing its contents; and, (2) that the information in the letters was so detailed and specific that Thompson must have obtained it - perforce, res ipsa loquitur  – from protected records.

In some instances, circumstantial evidence alone can support a finding that a disclosure came from a record.  For example, in *Doe v. U.S. Postal Service*, 317 F.3d 339, 342-43 (D.C. Cir. 2003), the panel found enough evidence <u>to survive summary judgment</u> in plaintiff's showing (I) that highly personal information included on a FLMA form was spread around shortly after the plaintiff submitted the form, and (ii) that the alleged disclosing party routinely reviewed such forms.  The D.C. Circuit has also treated the retrieval rule more flexibly when the record in question was created by the party who disclosed it.  Thus, the

Privacy Act can be violated in the "peculiar" circumstance of "disclosure by an agency official of his official determination made on the basis of an investigation which generated a protected personnel record" even when it was unclear whether the disclosed "information [was] directly retrieved from a tangible recording." *Bartel v. Federal Aviation Administration, et al.,* 725 F.2d 1403, 1408-09 (D.C. Cir. 1984),

The *Bartel* panel, however, carefully limited its holding to the facts of that case, *Bartel*, 725 F.2d at 1409, and the facts of the instant case are easily distinguished: Thompson's complaint initiated the investigation but was not the product of it;  Thompson was never a member of the investigatory team; and her complaint was not a "determination" by a supervising official.  *Bartel* does not render Thompson's disclosure of information in her complaint a Privacy Act violation (if, indeed, that is what she did).

The record of this case establishes nothing more than that Thompson collated what she knew from her own complaint, from her own observations and speculation and those of others, from the rumor-mill that apparently goes virtually unchecked at TIGTA, and from other non-covered sources.  Thompson denies having accessed or viewed any of the plaintiff's personnel documents or records connected to his investigation documents and claims to have gleaned the information in her letters from observation and

surmise.  *See generally*, Aug. Tr.  Her general evasiveness and
unreliability as a witness does not operate as proof of the
propositions that she denies, in the absence of any evidence that
Thompson accessed relevant protected records, that it was a part
of her duties to do so, or that anyone who did have access
disclosed information to her from those records.

Even the most troubling and specific reference in
Thompson's letter - that Armstrong had made an admission to
investigators - more likely came from an unprotected source than
from a record contained in a system of records.  The individuals
who investigated Armstrong may have inadvertently disclosed this
information, or been overheard discussing the matter.  Thompson,
as she claimed, may have guessed that the plaintiff would admit
improper access when confronted with the evidence against him,
such as access logs.  Or this could be a situation "where
information was inadvertently leaked from a record, became part
of general office knowledge, and some time later was disclosed
purportedly as a matter within the discloser's personal
knowledge."  *Bartel*, 725 F.2d at 1410.  The circumstantial
evidence is simply too tenuous to provide the preponderance
necessary to prove a Privacy Act violation.

**2. The Tort Claims**

Armstrong's libel claim became moot with Davis's
dismissal.  His other tort claims - even assuming that they are

procedurally in order and that Thompson and others were acting
within the scope of their employment (the defendant has not
meaningfully contested those propositions) - are either barred by
28 U.S.C. § 2680(h) or unsupported by the evidence.

      The negligent infliction of emotional distress count
was correctly withdrawn by the plaintiff as unsupported by the
facts.  False light claims have been generally recognized as
"barred by the libel and slander exception" of §2680(h).  *Edmonds
v. U.S.*, 436 F.Supp.2d 28, 35 (D.D.C. 2006) (*citing Johnson v.
Sawyer*, 47 F.3d 716, 732 n. 34 (5th Cir.1995); *Metz v. United
States*, 788 F.2d 1528, 1535 (11th Cir.1986)).  The plaintiff
rightly concedes that the prospective interference with a
contractual relationship claim is also barred.  *Art Metal-U.S.A.,
Inc. v. U.S.*, 753 F.2d 1151 (D.C. Cir. 1985).  Although
intentional infliction of emotional distress is not explicitly
excluded from the FTCA, the IIED claim stemming from Thompson's
acts cannot be sustained because it arises out of libel and
interference with prospective contractual relationship claims.
28 U.S.C. §2680 (barring "[a]ny claim arising out of . . . libel,
slander, . . . or interference with contract rights."); *Kugel v.
U.S.*, 947 F.2d 1504 (D.C. Cir. 1991) ("In assessing the nature of
[a] claim . . . we must scrutinize the alleged cause of his
injury."); *see, Majano v. U.S.*, 545 F.Supp.2d 136, 147 (D.D.C.
2008).  To the extent that the plaintiff still alleges IIED based

on a theory that TIGTA's investigation into the letters was designed to harm him through the dissemination of information, I find there is insufficient evidence to support either the requisite level of intent or extreme conduct, regardless of whether the relevant acts were employment related.  *See, Kassem v. Washington Hosp. Center*, 513 F.3d 251, 255-57 (D.C. Cir. 2008).  Last, the plaintiff has not articulated a coherent legal theory of liability for invasion of his seclusion that is supported by the evidence or case law and that isn't barred by §2608(h).

*     *     *

By an order separate from these findings and conclusions, the Clerk will be directed to enter judgment for the defendant.


                              JAMES ROBERTSON
                       United States District Judge